UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CENTRAL BANK OF INDIA and EXPORT-IMPORT BANK OF INDIA,<br><br>　　　　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>U.S. BANK NATIONAL ASSOCIATION,<br><br>　　　　　　　　　　Defendant. | Index No:<br><br>**COMPLAINT** |

Plaintiffs Central Bank of India ("CBI") and Export-Import Bank of India ("EIBOI") (together, the "Supplier Credit Lenders" or "Plaintiffs"), by and through their undersigned attorneys, for their Complaint against Defendant U.S. Bank National Association ("U.S. Bank" or "Defendant"), allege as follows:

**NATURE OF THE ACTION**

1.　Plaintiffs and Defendant are secured lenders to Essar Steel Minnesota, LLC ("ESML") and, in connection therewith, parties to an intercreditor agreement dated September 30, 2014 (the "Intercreditor Agreement"). The Intercreditor Agreement sets forth the understanding between Plaintiffs, Defendant and ESML's other secured lenders with respect to their relative rights, obligations and priorities in connection with their separate loans to ESML.

2.　ESML filed for bankruptcy in June 2016. As would be expected from secured lenders whose claims to the debtor's collateral are, as memorialized in the Intercreditor Agreement, *pari passu*, Plaintiffs and Defendant spent the eighteen months after the bankruptcy was filed negotiating with ESML their pro rata treatment under the debtor's Plan of Reorganization. During such time, Defendant never questioned the parties' rights and obligations under, or the

1

enforceability of, the Intercreditor Agreement.

3. Defendant confounded Plaintiffs, therefore, when, on December 22, 2017 (the Friday before the Christmas holiday), and one hour before ESML's Plan of Reorganization was scheduled to go effective, it filed an objection to Plaintiffs' claims (the "Claim Objection") in the bankruptcy case. As a result of Defendant's filing of the Claim Objection – which has not been adjudicated – Plaintiffs' distributions under the Plan have been escrowed and Plaintiffs have been (and remain) deprived of the distributions of collateral and other property agreed to under the plan.

4. In the Intercreditor Agreement, Defendant agreed not to "challenge or question in any proceeding the validity or enforceability" of Plaintiffs' claims to the ESML collateral. In filing the Claim Objection, Defendant breached this promise. By prosecuting the Claim Objection, Defendant continues to breach this promise.

5. By this action, Plaintiffs seek: (i) a declaration from the Court that the ongoing and future prosecution of Defendant's Claim Objection violates and will continue to violate the Intercreditor Agreement; and (ii) damages resulting from Defendant's breach of the Intercreditor Agreement, including attorneys' fees incurred in responding to Defendant's Claim Objection and losses resulting from the rejection, if any, of Plaintiffs' claims in bankruptcy due to Defendant's bad faith Claim Objection.

## THE PARTIES

6. CBI is a banking organization headquartered in, and existing under the laws of, India.

7. EIBOI is a banking organization headquartered in, and existing under the laws of, India.

8. Upon information and belief, U.S. Bank is a commercial bank with its headquarters

at 425 Walnut Street, Cincinnati, Ohio 45202.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between a citizen of a State and citizens of a foreign state.

10. Jurisdiction and venue is proper in this District because, pursuant to Section 9.7(a) of the Intercreditor Agreement, each party thereto:

> hereby irrevocably and unconditionally submits . . . to the exclusive jurisdiction of any New York State court or federal court of the United States of America sitting in New York City . . . and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding shall be heard and determined in such New York State Court or, to the extent permitted by law, in such federal court.

Further, Section 9.7(d) of the Intercreditor Agreement states:

> Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any New York State or federal court.

The Intercreditor Agreement is governed by New York law.

## FACTUAL BACKGROUND

11. ESML was formed to develop and operate an iron ore pellet mine and production facility in the western Mesabi range in northern Minnesota (the "Project"). To this end, ESML entered into a Supply and Engineering Contract dated May 5, 2010 (the "Supply and Engineering Contract") with its affiliate, Essar Projects (India), Limited ("EPIL"), pursuant to which EPIL was to provide goods, equipment and engineering services to ESML for construction of the Project in exchange for $215 million.

3

12. To finance EPIL's provision of goods and services to ESML, EPIL entered into separate facility agreements with CBI and EIBOI in August 2010 (hence, the reference to CBI and EIBOI collectively as the "Supplier Credit Lenders"). The Supplier Credit Lenders agreed to make certain loans totaling up to Indian Rupees 900 crore to EPIL in connection with EPIL's obligations under the Supply Contract.

13. The same year, on December 29, 2010, ESML entered into a multi-tranche term loan (the "2010 Credit Agreement") with a syndicate of banks led by ICICI Bank (the "Project Finance Lenders"). Pursuant to the 2010 Credit Agreement, the Project Finance Lenders agreed to provide ESML with a loan of up to $530 million.

14. It was the intent of ESML from the initiation of the Supplier Credit Lenders' loan in 2010 to provide collateral as security to the Supplier Credit Lenders, effectively acting as a guarantor of the Supplier Credit Lenders' loan to EPIL. This intention is reflected in ESML's 2010 Credit Agreement (with ICICI Bank et al.), which requires ESML to create "for the ratable benefit of the Secured Parties a valid and enforceable security interest in the Collateral . . . owned by [ESML]." The 2010 Credit Agreement defines "Secured Parties" to include "each of the Upstream Supplier Financing Creditors (sharing *pari passu* in respect of the security interests of the Lenders in the Collateral, directly or through EPIL under the Supplier Financing)." The "Upstream Supplier Financing Creditors" are further defined in that agreement as "the providers of supplier financing to EPIL, namely, the Export-Import Bank of India and the Central Bank of India." To effectuate this security interest, ESML entered into a security agreement dated December 29, 2010, granting a security interest in its collateral to the "lenders in respect of the Supplier Financing."

15. EPIL and the Supplier Credit Lenders entered into a joint facility agreement dated

June 1, 2012 (the "Facility Agreement") to document the Supplier Credit Lenders' Indian Rupees 900 crore loan to EPIL.  As set forth in Section 3.2.1 of the Facility Agreement, the Supplier Credit Lenders' loans were to be secured by, *inter alia*, (i) an assignment of all contracts, rights, securities and insurances of EPIL with respect to ESML in favor of the Supplier Credit Lenders on a *pari passu* basis; (ii) an undertaking by ESML to pay the Supplier Credit Lenders, from the escrow account maintained by ESML with the Project Finance Lenders, in accordance with the waterfall mechanism set forth in the Facility Agreement; (iii) an assignment of the Project Finance Lenders' and EPIL's mortgage over ESML's property; and (iv) an assignment of a pledge of 51% of shares of ESML created in favor of the Project Finance Lenders and EPIL.

16. In furtherance of its commitment in Section 3.2.1 of the Facility Agreement, EPIL assigned to the Supplier Credit Lenders "the Assigned Rights as security for the Secured Liabilities" in an assignment deed dated June 1, 2012.  The Assigned Rights include, *inter alia*, "all contracts, rights, securities and insurances of [EPIL] with respect to the Supply and Engineering Contract dated May 5, 2010" between EPIL and ESML, and "all rights, securities created in favor of [EPIL] under the Security Documents."

17. On June 14, 2012, ESML provided an acknowledgement of the assignment to CBI, as Facility Agent for the Supplier Credit Lenders, stating that ESML consented to the terms of the assignment.  The acknowledgment stated that ESML will not, without the prior written consent of the Supplier Credit Lenders, "incur, assume or raise any further secured debt for the Project and create any Security Interest therefor ranking *pari passu* with the Project Lenders on the Assigned Contract . . . during the currency of the Facilities."  ESML repeated this promise to the Supplier Credit Lenders in an "Undertaking" dated the same day, which was entered into "in consideration of the [Supplier Credit Lenders] granting the Facilities to [EPIL] to enable [EPIL] to comply with

the terms of the [Supply and Engineering] Contract."

18.     On November 24, 2013, ESML, ICICI Bank (as the Facility Agent for the Project Lenders), CBI (as the Facility Agent for the Supplier Credit Lenders), and Wells Fargo Bank Northwest, N.A. (as the Security Agent), among others, entered into a Collateral Agency and Intercreditor Agreement (the "First Intercreditor Agreement") similar to the existing Intercreditor Agreement.  Section 2.1 of the First Intercreditor Agreement states: "As among the Secured Parties with respect to the Collateral, all Secured Obligations shall rank *pari passu*, no Secured Party shall be entitled to any preferences or priority over any other Secured Party and the Secured Parties shall share in the Collateral all proceeds thereof in accordance with the terms of this Agreement . . .."  First Intercreditor Agreement, § 2.1.  "Secured Parties" is expressly defined therein to include CBI and EIBOI.

19.     On March 3, 2014, ESML and EPIL entered into a letter agreement amending the Supply and Engineering Contract between the two parties (the "2014 Letter Agreement").  The 2014 Letter Agreement stated that the principal amount payable to EPIL by ESML shall be the lesser of (a) $182.75 million and (b) 85% of the Contract Price (as defined in the Supply Contract) invoiced by EPIL in accordance with Article 7 of the Supply and Engineering Contract.  On the same day, EPIL assigned its rights in the 2014 Letter Agreement to the Supplier Credit Lenders, and also assigned them its rights in a March 3, 2014 mortgage on ESML's property in Minnesota.

20.     ESML needed additional financing for its Project in 2014 due to cost overruns.  As a result of its obligations to the Supplier Credit Lenders, however, ESML could not incur this additional indebtedness without the Supplier Credit Lenders' written consent to the additional lien on ESML's collateral.  The Supplier Credit Lenders ultimately agreed to ESML granting a further security interest to a third syndicate of lenders for which the Defendant serves as the loan agent

(the "Term Loan Lenders"), conditioned on the Term Loan Lenders entering into the Intercreditor Agreement.  More specifically, the Supplier Credit Lenders conditioned their consent to this new loan on the Term Loan Lenders agreeing, as spelled out in the Intercreditor Agreement and described further below, not to challenge the Supplier Credit Lenders' security interest in ESML's collateral.

21. Moreover, upon information and belief, prior to entering into their credit agreement with ESML, the Term Loan Lenders conducted due diligence into ESML's finances, by which they were aware of the Supplier Credit Lenders' security interest in ESML's collateral, including its mortgage on ESML's property.  Fully aware of ESML's existing obligations, the Term Loan Lenders entered into their credit agreement with ESML and the Intercreditor Agreement with the Supplier Credit Lenders on the same day, September 30, 2014.  The Defendant executed the Intercreditor Agreement as agent for the Term Loan Lenders.

22. The Intercreditor Agreement describes ESML's secured obligations to each of the three sets of secured lenders (the Supplier Credit Lenders, the Project Finance Lenders, and the Term Loan Lenders) and provides, among other things, that each of the three sets of secured lenders shall, if necessary, recover from ESML's collateral on a *pari passu* basis.

23. Section 2.2 of the Intercreditor Agreement sets forth the Term Loan Lenders' (including the Defendant's) agreement not to challenge the Supplier Credit Lenders' rights to the ESML collateral.  Specifically, in Section 2.2, each of the secured lenders mutually agrees not to:

> challenge or question in any proceeding the validity or enforceability of any Secured Obligations of any Series or any Security Document or the validity, attachment, perfection or priority of any Lien under any Security Document or the validity or enforceability of the priority, rights or duties established by or other provisions of [the Intercreditor Agreement].

24. Notwithstanding this absolute prohibition against the Term Loan Lenders objecting

to the Supplier Credit Lenders' claims, the Intercreditor Agreement does not prevent the Supplier Credit Lenders from, in any way, enforcing its terms against the Term Loan Lenders: "nothing in this [Intercreditor] Agreement shall be construed to prevent or impair the rights of any Secured Party to enforce this [Intercreditor] Agreement." *Id.*

25. On July 8, 2016, ESML filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*., in the United States Bankruptcy Court for the District of Delaware.

26. On September 29, 2016, the Supplier Credit Lenders timely filed proofs of claim with the bankruptcy court, asserting secured claims in an aggregate amount of not less than $150,416,096 at applicable exchange rates in connection with the prepetition provision of goods, equipment and services to ESML as set forth in the various documents and agreements described above.

27. On June 8, 2017, following months of extensive negotiations among the Debtors, the secured lenders, and other parties in interest – negotiations in which the Term Loan Lenders and the Supplier Credit Lenders were directly involved – the Debtors filed their Third Amended Plan of Reorganization (the "Third Amended Plan"). The Third Amended Plan provided for *pari passu* treatment of all the prepetition secured lenders' claims, consistent with the terms of the Intercreditor Agreement. Defendant did not object to the Third Amended Plan.

28. Specifically, under the Third Amended Plan, confirmed by the Bankruptcy Court on June 13, 2017, the secured lenders (including the Supplier Credit Lenders) were entitled to receive pro rata shares (about 14%, in the case of the Supplier Credit Lenders) of: (i) approximately $23 million in cash collateral; (ii) $3 million in cash in reimbursement for their respective legal fees; and (iii) $300 million in notes to be issued by the reorganized debtors (clauses (i), (ii) and

(iii) collectively, the "Secured Lender Plan Distribution").

29. The Third Amended Plan provides that, unless an objection to any of the secured lenders' claims is pending on the Effective Date, the secured lenders' claims are deemed "Allowed Claims" for distribution purposes under the Plan.

30. Late on Friday, December 22, 2017, an hour before the Debtors filed their notice of the Effective Date, which would (among other things) permit distributions to be made to the secured lenders under the Third Amended Plan, Defendant filed the Claim Objection. Defendant's action breached the Intercreditor Agreement, wherein Defendant agreed, on behalf of the Term Loan Lenders, not to challenge or question the validity or enforceability of the Supplier Credit Lenders' claims in any proceeding.

31. During the entirety of the fifteen months after the Supplier Credit Lenders submitted their proofs of claim, the Defendant never indicated any opposition to the Supplier Credit Lenders' pro rata treatment, including under the Third Amended Plan.

32. If not for the Term Loan Lenders' eleventh-hour Claim Objection, the Supplier Credit Lenders would have received their pro rata share of the Secured Lender Plan Distribution to which they are entitled under the Intercreditor Agreement and the Third Amended Plan.

33. Instead, Defendant's Claim Objection – in breach of its obligations under the Intercreditor Agreement – has deprived Plaintiffs of the distributions to which they otherwise are entitled. Defendant's breach appears to be a transparent attempt to hold the Plaintiffs' distributions hostage to extract a bigger piece of the pie than that to which Defendant is due.

34. Plaintiffs' security interest in the ESML collateral predates that of Defendant. Plaintiffs would not have consented to the Term Loan Lenders' security interest in ESML's collateral absent Defendant's agreement not to challenge the validity or enforceability of Plaintiffs'

claim to that same collateral. Defendant's agreement was memorialized in the Intercreditor Agreement. In filing its Claim Objection, Defendant has breached this agreement, deprived Plaintiffs of the benefit of their bargain and put them in a worse position than they would have found themselves in had they simply forced ESML into bankruptcy in 2014, prior to the Term Loan Lenders' loan. Defendant's actions, taken in breach of the Intercreditor Agreement and in bad faith, must be remedied by this Court, which has jurisdiction over matters involving breach of the Intercreditor Agreement.

## COUNT 1
(Breach of Contract)

35. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 34 of their Complaint, as if fully set forth herein.

36. Plaintiffs and Defendant entered into the Intercreditor Agreement, which is a valid, binding and enforceable written agreement.

37. Plaintiffs have performed their obligations under the Intercreditor Agreement.

38. Defendant breached Section 2.2 of the Intercreditor Agreement by objecting to the Supplier Credit Lenders' claim in the ESML bankruptcy.

39. Defendant continues to breach Section 2.2 of the Intercreditor Agreement by prosecuting the Claim Objection in the ESML bankruptcy.

40. Plaintiffs have been damaged in an amount to be determined at trial, but no less than the amount of their pro rata share of the Secured Lender Plan Distribution already distributed to the Term Loan Lenders and other secured lenders.

41. Because the attorneys' fees Plaintiffs incurred and will incur in responding to the Defendant's objection in the Delaware bankruptcy proceeding and in filing this Complaint flow directly from Defendant's breach, and because Defendant's breach was obvious and in bad faith,

Plaintiffs are entitled to recover their attorneys' fees in this litigation and in responding to Defendant's Claim Objection.

42. Plaintiffs' damages, in opposing Defendant' Claim Objection, are ongoing and, if Defendant succeeds in having Plaintiffs' claims disallowed in the bankruptcy case, will include the full value of Plaintiffs' pro rata share of the Secured Lender Plan Distribution as agreed to under the Third Amended Plan.

### COUNT 2
(Declaratory Judgment)

43. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 42 of their Complaint, as if fully set forth herein.

44. Defendant has breached Section 2.2 of the Intercreditor Agreement by objecting to the Plaintiffs' claims in the ESML bankruptcy.

45. Defendant continues to breach Section 2.2 of the Intercreditor Agreement by prosecuting the Claim Objection in the ESML bankruptcy.

46. Plaintiffs have been damaged in the amount of their pro rata share of the Secured Lender Plan Distribution agreed to under the Third Amended Plan, and their attorneys' fees incurred in this action and in responding to the objection in Delaware flow directly from Defendant's breach.

47. There is an actual and justiciable controversy because Defendant continues to prosecute its objection to Supplier Credit Lenders' claim in the Delaware Bankruptcy Court in contravention of its obligations under the Intercreditor Agreement.

48. Accordingly, Plaintiffs are entitled to a declaration from this Court that Defendant has violated Section 2.2 of the Intercreditor Agreement and continues to violate Section 2.2 of the Intercreditor Agreement by prosecuting the Claim Objection.

WHEREFORE, Plaintiffs respectfully demand judgment as follows:

(1) A declaration that the Defendant has breached Section 2.2 of the Intercreditor Agreement;

(2) A declaration that Defendant continues to breach Section 2.2 of the Intercreditor Agreement by prosecuting the Claim Objection;

(3) An award of damages flowing directly from Defendant's breach, including, but not limited to, (i) attorneys' fees, (ii) Plaintiffs' pro rata share, as required by the Intercreditor Agreement, of the Secured Lender Plan Distribution distributed to Defendant and the other secured lenders to date, and (iii) if Plaintiffs' claims are disallowed in the bankruptcy case, the value of Plaintiffs' pro rata share, as required by the Intercreditor Agreement, of the Secured Lender Plan Distribution;

(4) That Plaintiffs be awarded their costs incurred herein, and;

(5) That this Court order whatever other and further relief for Plaintiffs as the Court may deem just and proper.

Dated: New York, NY
January 22, 2018

        BAILEY DUQUETTE P.C.

        By: /s/ James D. Bailey
        James D. Bailey
        David I. Greenberger
        Eric Wertheim
        100 Broadway, 10th Floor
        New York, NY 10005
        Telephone: (212) 658-1946
        Email: james@baileyduquette.com
        *Attorneys for Plaintiffs Central Bank of India and Export-Import Bank of India*